UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| LISA MAUREEN RIDENER, <br> DARWIN RIDENER, <br><br> Plaintiffs, <br><br> v. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br> TERRY STIGDON, <br> MICHELLE RUSSELL, <br> KELSEY SMITH, <br> KELSEY BARRETT, <br> WHITNEY MCKAY, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 4:21-cv-00074-KMB-TWP <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Presently pending before the Court is Defendants' Motion for Summary Judgment. [Dkt. 81.] Defendants—Michelle Adams (f/k/a Michelle Russell), Kelsey Smitha, Kelsey Barrett, and Whitney McKay—are Indiana Department of Child Services ("DCS") employees who Plaintiffs Lisa and Darwin Ridener (the "Rideners") allege unlawfully removed their adoptive children (the "Children") from the Rideners' care in March 2020. [Dkts. 21; 68.] In their Second Amended Complaint, [dkt. 21], the Rideners alleged various federal constitutional violations pursuant to 42 U.S.C. § 1983, but only the Rideners' Fourth Amendment claim survived the Motion for Judgment on the Pleadings previously filed by the Defendants, [dkt. 56]. Accordingly, the Rideners' only remaining cause of action in this case is their Fourth Amendment unreasonable seizure claim against Defendants Adams, Smitha, Barrett, and McKay. [Dkt. 68.] Defendants have asked the Court to enter summary judgment in their favor on that claim, and for the reasons detailed below, the Court grants the pending motion. [Dkt. 81.]

## I.  APPLICABLE STANDARD

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact, and instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P 56(a).  On summary judgment, a party must show what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "Summary judgment is not a time to be coy."  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The trial court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).

Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P 56(e)(2).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Factual disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. RELEVANT BACKGROUND

The following factual background is set forth pursuant to the standard explained above. The facts stated herein are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to the Rideners because they are "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

The Rideners were the adoptive parents of five children: E.A.R., J.S.R., J.T.R., E.G.R., and J.A.R. [Dkt. 82-1 at 4.] Two foster children also lived with the Rideners during the relevant time. [*Id.* at 11.] On March 14, 2020, DCS received a report alleging that the Children were victims of neglect and that E.A.R. was a victim of physical abuse. [Dkt. 82-3 at 5.] The report source indicated that Lisa was the perpetrator of such abuse and that "things [were] really bad" at the Rideners' home. [*Id.*] Defendant Barrett, who was a Family Case Manager for DCS, was assigned to investigate the allegations against the Rideners later that day. [*Id.*] After having Lisa

3

sign a consent form that authorized DCS to interview all five of the Children, [dkts. 81-7; 81-5 at 27-28], Barrett proceeded to interview the Children, Lisa, and one of the foster children living with the Rideners regarding the abuse allegations, [dkt. 82-3 at 5]. Based on information she obtained through these interviews—including Lisa's own statements that she had screamed at and used physical discipline on the Children—Barrett then scheduled emergency interviews of the five Children and the two foster children to be conducted later that evening at the Southeastern Indiana Child Advocacy Center ("CAC"). [*Id.*] During the CAC interviews, some of the Children and the two foster children disclosed abuse by Lisa. [*Id.*] J.A.R. was also observed with a mark/scar on the back of his head. [Dkt. 82-4 at 2.]

In light of the evidence obtained through her investigation, Barrett recommended that the Children be removed from the Rideners' care. [Dkts. 82-1 at 7-8, 15-17.] Defendant Smitha, who was Barrett's supervisor, signed off on Barrett's findings and recommendation. [Dkts. 82-1 at 7-8, 15-17.] At around 10:37 P.M. on March 14, 2020, Supervisor Wahl, who was the on-call supervisor, contacted the Switzerland County Circuit Court judge by phone to obtain an order to remove the Children. [Dkts. 81-5 at 30-31; 81-8 at ¶¶ 6, 15; 82-3 at 6.] Supervisor Wahl informed the judge of the evidence DCS had gathered to substantiate abuse and neglect findings, the judge provided verbal authorization over the phone for removal, and the Children were removed from the Rideners' care. [Dkts. 81-8 at ¶¶ 16-18; 81-5 at 31.]

Meanwhile, the Indiana State Police ("ISP") had begun investigating whether to bring criminal charges against the Rideners. [*See* dkt. 82-5.] ISP Officers Sergeant K. Main and Detective V. Patton were present at the CAC interviews on the night of March 14, 2020, and on March 16, 2020, Detective Patton and Sergeant Baxter, who was the Investigation Supervisor for the Versailles District Office of ISP, spoke with Lisa at her home. [*Id.* at 2, 4-5; Dkt. 81-9 at 7.]

4

After speaking with Lisa, Detective Patton and Sergeant Baxter met with the Switzerland County Prosecutor to discuss the findings from their investigation. [Dkt. 82-5 at 6.] Ultimately, the Prosecutor determined not to criminally charge Lisa. [*Id.*]

On March 17, 2020, DCS filed its Preliminary Inquiry[1] and requested that the Switzerland Circuit Court grant DCS leave to file a petition alleging that the Children were Children in Need of Services ("CHINS"). [Dkt. 82-1 at 2.] Having considered the Preliminary Inquiry, the Switzerland Circuit Court found that there was probable cause to believe that the Children were CHINS and therefore authorized DCS to files its CHINS petition. [Dkt. 82-6.] A hearing was held later that day, and the Switzerland Circuit Court found that probable cause existed for DCS's continued detention of the Children. [Dkt. 82-7 at 9-10.] The judge ordered that the Children remain in the Rideners' home but in the supervised care of their adult sister, Paige Ridener, and that the Rideners be excluded from the home. [*Id.* at 7-9.] DCS did not inform the Switzerland Circuit Court in its Preliminary Inquiry or during the hearing that law enforcement had declined to bring criminal charges against Lisa. [Dkts. 82-1; 82-7.]

On March 28, 2020, while the Children were in Paige's care, a fire broke out at the Rideners' home. [Dkt. 81-10 at 15.] Tragically, the Children and Paige all died in the fire. [*Id.* at 15, 19.] After an investigation, the Indiana State Fire Marshal was unable to determine the cause of the fire. [*Id.* at 20.]

### III. ANALYSIS

In support of their Motion for Summary Judgment, Defendants make five arguments: (1) that the Rideners cannot assert a Fourth Amendment claim individually because they were not

---

[1] A Preliminary Inquiry is a written report that summarizes all information that has been gathered during an investigation and the reasons why DCS is requesting that detention be upheld. [Dkt. 81-2 at 9-10.]

5

seized; (2) that the Children's Fourth Amendment claim did not survive their deaths; (3) that Defendants did not violate the Fourth Amendment; (4) that Defendants Adams and McKay were not sufficiently involved in the removal of the Children to be held liable under the Fourth Amendment;[2] and (5) that Defendants are entitled to qualified immunity. The Court will address the issues and arguments as necessary to resolve the pending motion.

### A. The Rideners do not claim that they were seized and therefore only assert a Fourth Amendment claim for the seizure of the Children.

As an initial matter, Defendants argue that the Rideners cannot assert a Fourth Amendment claim on behalf of themselves because they were never seized. [Dkt. 83 at 16.] Rather, Defendants contend that the Rideners' Fourth Amendment claim stems solely from the seizure of the Children. [*Id.*] Thus, Defendants take the position that any Fourth Amendment claim the Rideners "assert individually must be dismissed." [*Id.*]

The Rideners do not specifically respond to Defendants' argument that they were not seized or respond in any way to Defendants' position that they cannot assert a Fourth Amendment claim on behalf of themselves.

The Supreme Court has explained that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. U.S.*, 394 U.S. 165, 174 (1969). The Rideners claim that the Children were unreasonably seized, but they do not claim that they themselves were ever seized. This is understandable, given that no

---

[2] The Court notes that, while the Rideners assert their Fourth Amendment unreasonable seizure claim against Adams, Smitha, Barrett, and McKay, it is not clear how Defendants Adams and McKay were personally involved in the removal of the Children. Defendants argue that Adams and McKay were not sufficiently involved in the removal to be held liable. Nevertheless, because the Court finds that summary judgment is appropriate as to all Defendants on other grounds, the Court need not consider the individual roles that Adams and McKay may have played in the removal regardless of whether they were sufficiently involved to be liable under § 1983.

evidence has been submitted in connection with the pending motion to indicate that the Rideners themselves were ever seized. Thus, the Court finds that the Rideners have not brought a Fourth Amendment claim on behalf of themselves, and the Fourth Amendment claim at issue herein stems solely from the seizure of the Children and has been brought by the Rideners on behalf of the Children.

### B. The Rideners' Fourth Amendment unreasonable seizure claim did not survive the Children's deaths.

Defendants argue that the Rideners' Fourth Amendment unreasonable seizure claim on behalf of the Children did not survive the Children's deaths. [Dkt. 83 at 16.] According to Defendants, 42 U.S.C. § 1983 is silent on the issue of whether a particular claim survives death, but 42 U.S.C. § 1988 directs courts to look to the most analogous state law claim to determine survivability. [*Id.* at 17.] They claim that the Seventh Circuit Court of Appeals has held that a Fourth Amendment unreasonable seizure claim is most analogous to the common law tort of false imprisonment. [*Id.* at 16-17 (citing in *Bentz v. City of Kendallville*, 577 F.3d 776 (7th Cir. 2009)).] Defendants assert that under Indiana law, false imprisonment claims do not survive the death of the individual seized. [*Id.*] Therefore, Defendants argue that the Fourth Amendment claim did not survive the Children's deaths and fails as a matter of law. [*Id.*]

The Rideners respond that the Fourth Amendment claim did survive because the Children's deaths were allegedly related to and/or arising out of the unreasonable seizure claim. [Dkt. 89 at 5.] The Rideners contend that in *Bentz*, the Seventh Circuit held that courts should apply Indiana's survival statute unless it is inconsistent with federal policy to do so. [*Id.* at 6.] The Rideners concede that the Fourth Amendment unreasonable seizure claim here is comparable to Indiana's false imprisonment statute, such that under Indiana law a false imprisonment claim generally extinguishes upon death. [*Id.*] But the Rideners claim that their Fourth Amendment claim falls

7

under an exception to this rule because it allegedly was Defendants' unreasonable seizure of the Children that led to their deaths. [*Id.*] The Rideners point the Court to a different case by the Seventh Circuit Court of Appeals that they assert "allows a remedy in situations where application of a state's survival statute would leave the plaintiff without a remedy if a deceased could have sought redress had he survived the wrongdoing which gave rise to a constitutional claim, and the wrongdoing led to his death." [*Id.* at 7 (citing *Green v. Carlson*, 581 F.2d 669 (7th Cir. 1978)).]

In reply, Defendants argue that the Rideners' discussion of the survival issue is underdeveloped. [Dkt. 91 at 2.] To Defendants, however, it appears that the Rideners argue that application of Indiana's survival statute would be inconsistent with the purpose of § 1983, in which case the state law must be disregarded in favor of federal common law. [*Id.*] Defendants claim that this argument fails for two reasons: (1) Defendants' actions here did not cause the death of the Children, unlike the state action in *Green* that directly caused the death at issue in that case; and (2) federal policy as to the Fourth Amendment claim is consistent with Indiana's policy as to false imprisonment claims. [*Id.*]

> *1. The Rideners' Fourth Amendment unreasonable seizure claim is most analogous to the Indiana tort of false imprisonment, which does not survive death.*

The Court agrees with Defendants that the Fourth Amendment unreasonable seizure claim did not survive the Children's deaths. In *Bentz*, the plaintiff brought a Fourth Amendment claim under § 1983 against police officers who entered his home without a warrant, arrested him, and searched his home for potential domestic violence victims. *Bentz*, 577 F.3d at 777. The district court granted summary judgment in favor of the police officers, and the plaintiff appealed the decision. *Id.* But while the appeal was pending, the plaintiff "passed away from causes unrelated to the lawsuit." *Id.* The defendant moved to dismiss the appeal, "arguing that [the plaintiff's] claims did not survive his death." *Id.* at 778. The Seventh Circuit agreed and held that the

8

plaintiff's Fourth Amendment unreasonable seizure claim ended with his death. *Id.* at 780-81.

*Bentz* explained that § 1983 "is silent on the issue of survival, so 42 U.S.C. § 1988 directs us to look to the most closely analogous state law to determine survivability." *Id.* (internal quotation marks omitted). "When analyzing the survivability of § 1983 claims, we therefore apply the state survival statute unless it is inconsistent with federal policy." *Id.* To succeed on an unreasonable seizure claim, *Bentz* explained that the plaintiff's representative would need to show "that the government's conduct constituted a seizure and that the seizure was unreasonable," and that "[u]nder the Fourth Amendment, a person has been seized only if, in view of all circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 779 (internal quotation marks omitted). *Bentz* concluded that "[t]he standards for false imprisonment in Indiana are remarkably similar":

> Under Indiana law, false imprisonment is defined as the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent. As with the Fourth Amendment, where the police arrest a suspect without probable cause, they can be held liable for false imprisonment. In other words, a plaintiff may establish both a § 1983 claim and an Indiana false imprisonment claim where his freedom of movement was limited or restrained in some way without probable cause. The elements of the causes of action are nearly identical, and [plaintiff] could have framed his claim in terms of the Indiana tort of false imprisonment, federal law, or both.

*Id.* at 779-80 (internal quotation marks and citations omitted). Thus, *Bentz* concludes that "Indiana law establishes that [a] § 1983 claim for unreasonable seizure is analogous to an Indiana tort claim for false imprisonment, which does not survive a decedent's death." *Id.* at 780; *see* Ind. Code § 34-9-3-1(a)(4) ("If an individual who is entitled … in a cause of action dies, the cause of action survives and may be brought by … the representative of the deceased party *except actions for* … false imprisonment.") (emphasis added).

While *Bentz* concerned a Fourth Amendment unreasonable seizure claim against police

9

officers and not DCS employees, the Seventh Circuit has considered the Fourth Amendment's prohibition on unreasonable seizures in the child removal context. Like in the arrest context, the Fourth Amendment inquiry in the child removal context turns on whether a seizure occurred and whether the seizure was reasonable. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474-75 (7th Cir. 2011) (finding that "[r]emoving [a child] from his home and parents and taking him into protective custody qualifies as a seizure" and that "[i]n the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances"). Therefore, because the Fourth Amendment analysis in the child removal context is the same as in the arrest context, *Bentz* is instructive here, and the Court must conclude that the elements of a Fourth Amendment unreasonable seizure claim in the child removal context are analogous to the Indiana tort of false imprisonment.

In sum, Seventh Circuit precedent is clear that the Fourth Amendment unreasonable seizure claim here is most analogous to the Indiana tort of false imprisonment, which does not survive a decedent's death pursuant to Indiana law. Ind. Code § 34-9-3-1(a)(4). Accordingly, the Court must conclude that the Fourth Amendment unreasonable seizure claim that the Rideners bring on behalf of the Children—the only remaining pending claim in this lawsuit—extinguished upon the death of the Children. *See also Camm v. Clemons*, 544 F.Supp.3d 847, 855 (7th Cir. 2021) (finding that the plaintiff's "claim for unlawful arrest and detention because of lack of probable cause under the Fourth Amendment clearly is analogous to the Indiana tort of false imprisonment" and "that claims for false imprisonment … abate upon a party's death").

> *2. Application of Indiana's survival statute is not inconsistent with the policies underlying § 1983.*

Although the Rideners concede that the Fourth Amendment unreasonable seizure claim is

comparable to Indiana's false imprisonment statute and that such claims do not survive death, [dkt. 89 at 6], they nevertheless contend that this claim survived because DCS's allegedly unreasonable seizure led to the Children's deaths. The Rideners cite Seventh Circuit precedent that they contend supports their argument. [Dkt. 89 at 6 (citing *Green*, 581 F.2d at 675).]

At the outset, it is important to note that the Rideners' unreasonable seizure claim focuses on the Defendants' initial seizure, questioning, and subsequent removal of the Children, not on their deaths. Nevertheless, after reviewing *Green*, the Court concludes that the facts of that case are not analogous to the Rideners' case, and *Green* does not change the clear directive provided by *Bentz* as detailed above. The decedent at issue in *Green* died directly from improper medical care provided by prison medical staff. *See* 581 F.2d at 671 (explaining that decedent suffered an asthma attack, a medical training assistant administered two injections of a drug contraindicated for asthma attacks, and decedent suffered a respiratory arrest 30 minutes after the injections and was pronounced dead after being transported to a hospital). The Seventh Circuit held that "whenever the relevant state survival statute would abate a [federal] action brought against defendants *whose conduct results in death*, the federal common law allows survival of the action." *Id.* at 675 (emphasis added).

While the facts of this case are undeniably tragic, it is undisputed that the Children died from a fire of unknown origin two weeks after a report of abuse and neglect led to Defendants becoming involved with the Rideners and the Children being removed from the Rideners' care and placed with their adult sister, Paige. The Rideners suggest that Defendants' actions "led to the deaths" of the Children because Paige had two prior alcohol-related offenses and DCS allegedly did not follow its typical waiver process related to that during a hearing. [Dkt. 89 at 5, 7.] But the Rideners cannot allege that Defendants' actions caused the deaths of the Children, given the

11

circumstances surrounding their deaths and the completely speculative nature of any connection the Rideners try to make between that and the Defendants' conduct. In fact, the evidence indicates that the Rideners consented to having the Children placed with Paige. [*See* dkt. 82-7 at 7-8 ("[DCS] has been able to work with the Rideners in reaching an agreement that the [C]hildren would stay in the house with Lisa's adult daughter."); dkt. 81-5 at 31-32 (Barrett explaining that the Rideners consented to placement with Paige because she "received [Paige's] name from Lisa Ridener herself to explore and potentially be a placement").] But the deaths of the Children two weeks later were neither the Rideners' fault nor the Defendants' fault—rather, the evidence before the Court shows that their tragic and untimely deaths were the result of a fire of unknown origin for which neither the Defendants nor the Rideners were responsible.

For all of these reasons, the Court finds *Green* distinguishable and not instructive in this case. Because the Children's deaths were "not caused by the deprivation of rights for which [the Rideners] sued under § 1983," the Court concludes that the policies underlying § 1983 are not frustrated by applying Indiana's survival statute herein. *Robertson v. Wegmann*, 436 U.S. 584, 594 (1978). "A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation." *Id.* at 593. Rather, courts must consider in each case "whether application of state law would be inconsistent with the federal policy underlying the cause of action under consideration." *Id.* at 590. "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Id.* at 590-91.

First, as to compensation, § 1983 seeks to compensate those injured by the alleged deprivation, not survivors such as the Rideners. *See id.* at 592 (finding that "[t]he goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation

of one who is merely suing as the executor of the deceased's estate"). Second, as to the prevention of abuses of power, most causes of action do not abate upon death under Indiana's survival statute, so the abatement of limited causes of action does not "adversely affect § 1983's role in preventing official illegality, at least in situations in which there is no claim that the illegality caused the plaintiff's death." *Id.*; *see also* Ind. Code § 34-9-3-1 (stating that all causes of action, except for six enumerated causes of action, survive death and may be brought by the representative of the deceased party). Put another way, state officials that consider engaging in "illegal activity must always be prepared to face the prospect of a § 1983 action being filed against [them]." 436 U.S. at 592. But even state officials "aware of the intricacies of [Indiana] survivorship law would hardly be influenced in [their] behavior by its provisions." *Id.* For these reasons, the Court concludes that application of Indiana's survival statute in this case does not hinder the general policy behind § 1983 of preventing abuses of power.[3]

The facts of this case are undeniably tragic. However, based on binding precedent, the Court must conclude that the Fourth Amendment unreasonable seizure claim at issue is analogous to the Indiana tort of false imprisonment, which undisputedly did not survive the Children's death. Moreover, because application of Indiana's survival statute is not inconsistent with federal policy as detailed herein, the Court concludes that the Defendants are entitled to judgment as a matter of law on the Rideners' sole remaining claim in this litigation.

---

[3] The Court notes that, in their Statement of Claims, the Rideners identify three theories of liability with respect to their Fourth Amendment unreasonable seizure claim: (1) Barrett took the Children into custody for interrogation; (2) the Children were removed from the care of the Rideners by judicial deception; and (3) Defendants kept the Children separated from the Rideners until the incident that claimed their lives. [Dkt. 68 at 5.] Because all three theories hinge on whether Defendants' actions were supported by probable cause, and because each is a Fourth Amendment unreasonable seizure claim, all three theories of liability fail as a matter of law for the reasons stated herein.

13

### C. Even if the Fourth Amendment unreasonable seizure claim had survived the Children's deaths, Defendants would be entitled to qualified immunity.

While the Court has already concluded that the Defendants are entitled to judgment as a matter of law on the Rideners' sole remaining claim, it will also analyze the Parties' arguments regarding qualified immunity out of an abundance of caution.

It is undisputed that the Defendants are state actors and, as such, they argue that they are entitled to qualified immunity from Fourth Amendment claims where they reasonably could have believed removal to be lawful. [Dkt. 83 at 32.] They contend that a reasonable caseworker could have believed that the removals here were lawful because the Children were detained by a court order, and the totality of the evidence indicated that probable cause existed to support the removals. [*Id.*]

The Rideners respond that qualified immunity does not apply here because Defendants' conduct violated clearly established rights. [Dkt. 89 at 11.] They contend that it is well-settled that a state actor violates the Fourth Amendment if he or she knowingly, intentionally, or with reckless disregard for the truth makes false statements or withholds material information to establish probable cause for a seizure. [*Id.* at 12.] Here, the Rideners claim that DCS omitted material facts when seeking a judicial order for the Children's removal—specifically, that Barrett allegedly made affirmative misrepresentations and omitted material facts from the Preliminary Inquiry form and that DCS allegedly omitted material facts when it sought a waiver regarding the Children's placement with Paige. [*Id.* at 1-4.] Thus, the Rideners conclude that a reasonable caseworker would have known that such conduct violated the Children's rights. [*Id.*]

In reply, Defendants reiterate that a reasonable caseworker could have believed that probable cause existed for the removal based on the evidence discovered during the DCS investigation. [Dkt. 91 at 14-15.] Defendants also emphasize that the plaintiff bears the burden

14

of demonstrating the violation of a clearly established right, and the Rideners do not cite specific caselaw with similar facts showing that Defendants violated the Children's clearly established rights. [*Id.*] Instead, Defendants argue that the Rideners describe Fourth Amendment rights at a high level of generality, which is insufficient in the qualified immunity context. [*Id.*]

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). State actors "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023). "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas,* 755 F.3d 529, 537 (7th Cir. 2014) (emphasis omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236.

"To counter the defense of qualified immunity, a plaintiff must show that the constitutional right at issue was clearly established at the time of the alleged violation." *Greene v. Teslik*, 2023 WL 2320767, at *3 (7th Cir. Mar. 2, 2023) (internal quotations and citation omitted). In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). While a plaintiff "need not produce a case directly on point, … the 'legal principle [must] clearly prohibit

the [official's] conduct in the particular circumstances before him." *Pierner-Lytge*, 60 F.4th at 1044 (quoting *Wesby*, 138 S. Ct. at 690). The clearly established law "must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022). A plaintiff cannot escape the application of qualified immunity by defining in a general manner the constitutional right that she claims was violated. *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). As the Seventh Circuit has explained, defeating qualified immunity "sounds like a high bar because it is—qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez v. Sheriff of Cook Cnty.*, F.3d 981, 988 (7th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In the child removal context, the Seventh Circuit has explained that when deciding a case based on qualified immunity, courts "need not determine whether probable cause in fact existed at the time of [a] removal decision." *Xiong v. Wagner*, 700 F.3d 282, 290 (7th Cir. 2012). Instead, courts "may rule on qualified immunity grounds that a reasonable caseworker *could have believed* that probable cause existed and accordingly wouldn't have understood [her] actions to violate a constitutional right." *Id.* (emphasis in original). Therefore, "as long as [DCS] workers could have believed [the Children's removal] to be lawful, in light of clearly established law and the information [they] possessed, [D]efendants are entitled to qualified immunity." *Id.* (internal quotation marks and citation omitted).

The Rideners cite three main cases in support of their argument that the Children's constitutional rights were clearly established and that a reasonable DCS caseworker would have known that making false representations or withholding material information to obtain removal violated the Children's constitutional rights. [Dkt. 89 at 11-12.] In *Brokaw v. Mercer County*, the Seventh Circuit Court of Appeals "note[d] that to the extent the defendants knew the allegations

16

of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause, [a child's] removal from his home, they violated the Fourth Amendment." 235 F.3d 1000, 1012 (7th Cir. 2000). Likewise, in *Brokaw v. Weaver*, the Seventh Circuit Court of Appeals explained "that if 'the finding of probable cause is based on the defendant's intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed with a Fourth Amendment claim challenging the reasonableness of the'" seizure. 305 F.3d 660, 670 (7th Cir. 2002) (quoting *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989)). And finally, in *Rainsberger v. Brenner*, the Seventh Circuit Court of Appeals found that "[a]n officer similarly violates the Fourth Amendment if he intentionally or recklessly withholds material information from a probable cause affidavit." 913 F.3d 640 (7th Cir. 2019) (citing *Whitlock v. Brown*, 596 F.3d 406, 410-11 (7th Cir. 2010)).

While the Court acknowledges that intentional misrepresentations and the withholding of material facts in the context of a child's removal from the home certainly could give rise to a Fourth Amendment claim, the cases cited by the Rideners do not help them overcome the Defendants' qualified immunity defense given the facts at issue in this case. As detailed more below, the cited cases are not factually analogous to the present situation and do not demonstrate that the Defendants' specific conduct constituted the withholding or misrepresentation of material information such that probable cause was not present for the removal of the Children or qualified immunity does not apply. *See Pierner-Lytge*, 60 F.4th at 1044 (quoting *Wesby*, 138 S. Ct. at 690) (explaining that while a plaintiff "need not produce a case directly on point, … the 'legal principle [must] clearly prohibit the [official's] conduct in the particular circumstances before him"); *Doxtator*, 39 F.4th at 863 (explaining that the clearly established law "must share specific details with the facts of the case at hand"). At bottom, the Rideners do not cite any evidence to negate the

fact that a reasonable caseworker could have believed that there was probable cause for the Children's removal from the Rideners' care based on the undisputed facts known at the time of removal which supported probable cause for that removal.

The Rideners identify several facts that they claim constitute material disputes, all of which relate to evidence that Defendants allegedly withheld or misrepresented: (1) that DCS sought telephonic authorization for removal from the Switzerland County Circuit Court before it completed interviews of all the Children, such that the judge was allegedly not informed of certain statements made after that point that contradicted the abuse claims; (2) that DCS did not inform the juvenile court of the subsequent decision not to criminally charge the Rideners; (3) that DCS did not specifically inform the Switzerland Circuit Court about Paige's criminal history; and (4) that DCS did not specifically inform the Switzerland Circuit Court about the Children's alleged mental deficits and previous unsubstantiated allegations of abuse against the Rideners, and Barrett made misrepresentations about the two videos on which the allegations of abuse were based. [Dkt. 89 at 1-5.]

Importantly, the Rideners expressly acknowledge in their response brief that the Children disclosed abuse at the hands of Lisa. [*See* dkt. 89 at 1.] This evidence, which the Rideners do not challenge, is sufficient for a finding that a reasonable caseworker could have found probable cause for removal. *See* Fed. R. Civ. P 56(e)(2) (where a party fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion). Moreover, the record shows that there was a significant amount of additional evidence. DCS conducted interviews with the Children and two foster children after receiving reports of neglect and abuse in the Rideners' home, and several disclosures made during these interviews confirmed improper discipline, neglect, and physical abuse in the Rideners' home. [*See* dkt. 82-3

18

at 5.] Lisa admitted to yelling at and using physical discipline on the Children, and one child disclosed that Lisa had threatened to hit him if he to spoke with anyone about a prior injury allegedly caused by Lisa. [*Id.*; Dkt. 82-3 at 6.] DCS observed and documented a mark/scar on J.A.R., which corroborated reports of physical abuse. [Dkt. 82-4 at 2.] Based on all of this evidence, a reasonable caseworker certainly could have believed that there was probable cause for removal. Defendants also could have reasonably believed that their actions did not violate the Fourth Amendment because Lisa consented to having DCS interview the Children, [dkts. 81-7; 81-5 at 27-28]; DCS received a verbal order from the Switzerland Circuit Court for the initial removal of the Children, [dkts. 81-5 at 31; 81-8 at ¶¶ 16-18]; and the Switzerland Circuit Court subsequently found probable cause for the continued detention of the Children. [Dkt. 82-7 at 9-10.]

After a thorough analysis of all the evidence, the Court cannot conclude that the assertions made by the Rideners regarding alleged misstatements or omissions, even if accepted as true, would change the outcome of this case because a reasonable caseworker still could have believed that there was probable cause for removal based on the totality of evidence available to DCS. *See Hampton*, 561 F.3d at 713 (finding that a fact is material if it might affect the outcome of the suit); *Harper*, 433 F.3d at 525 (explaining that while facts might be in dispute, summary judgment is appropriate if those facts are not outcome determinative). Accordingly, Defendants reasonably could have believed that the removal was lawful, and they are entitled to qualified immunity.

## IV. CONCLUSION

While the facts of this case are undeniably tragic and while the Court recognizes the tremendous loss that the Rideners have experienced, the law requires the Court to conclude that the Defendants are entitled to judgment as a matter of law on the Rideners' sole remaining claim

in this litigation. For the reasons stated herein, the Court **GRANTS** Defendants' Motion for Summary Judgment. [Dkt. 81.] Final judgment shall enter accordingly.

   **SO ORDERED.**

Date: 8/21/2023

*Kellie M. Barr*
Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email